Filed 12/11/25  P. v. Cortez CA6

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>ALBERTO SANCHEZ CORTEZ,<br><br>    Defendant and Respondent. | H052814<br>(Monterey County<br>Super. Ct. No. 19CR000357) |

Defendant Alberto Sanchez Cortez,[1] a life prisoner, was convicted by a jury of first degree murder and assault by a life prisoner.  A codefendant, Jaime Demecio Romero, was convicted of second degree murder.[2]  The trial court sentenced Sanchez Cortez to life without the possibility of parole (LWOP) enhanced by thirty years under Penal Code section 667, subdivision (a)(1)[3] and one year under section 12022, subdivision (b)(1).  The court imposed and stayed an additional LWOP term on the charge of assault by a life prisoner.

---

[1] In the record on appeal, the defendant is referred to as "Cortez."  We have adopted "Sanchez Cortez."

[2] Romero is not a party to this appeal.

[3] Unspecified statutory references are to the Penal Code.

On appeal, Sanchez Cortez contends that the prosecution failed to present substantial evidence that he premeditated or deliberated before he killed the victim in this case, Jose Alcantar Ortega, a fellow inmate.

As we explain below, we conclude that Sanchez Cortez's argument has no merit.  We will affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. *Procedural background*

On May 1, 2024, the Monterey County District Attorney filed an amended information charging Sanchez Cortez with first degree murder (§ 187, subd. (a); count 1) and with assault by a life prisoner by means of force likely to produce great bodily injury (§ 4500; count 2).  The amended information alleged that, as to count 1, Sanchez Cortez personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)).  As to counts 1 and 2, the amended information alleged that Sanchez Cortez had previously been convicted of first degree murder (§ 190.2, subd. (a)(2)) and had six prior strike convictions (§§ 667, subd. (a)(1), 1170.12, subd. (c)(2)(A)).

During trial, Sanchez Cortez admitted the six prior strike convictions (§§ 667, subd. (a)(1), 1170.12, subd. (c)(2)(A)) and his prior conviction for first degree murder (§ 190.2, subd. (a)(2)).

The jury convicted Sanchez Cortez of first degree murder (count 1), finding true the allegations that he acted willfully, with premeditation and deliberation, and that he personally used a deadly weapon.  The jury also found Sanchez Cortez guilty on count 2.

On October 23, 2024, the court sentenced Sanchez Cortez on count 1 to LWOP, enhanced by thirty years under section 667, subdivision (a)(1) and one

2

year under section 12022, subdivision (b)(1). As to count 2, the court imposed, but stayed pursuant to section 654, an additional LWOP term.

## B. Facts

### 1. Prosecution case

#### a. Correctional officers' testimony

On the morning of January 12, 2018,[4] correctional officer Jose Carmona was on duty in Facility B-4 at Salinas Valley State Prison (SVSP)[5] as the control booth officer. As control booth officer, Carmona could unlock the cell doors, although he explained that "staff member[s] or the inmates" could close and secure the cell doors.

During recall from the dayroom,[6] Carmona unlocked cells 101 to 117 around 11:18 a.m. At 11:21 a.m., the floor officers called out that there was a fight in a cell. As directed by Sergeant Mario Barroso, Carmona opened the door to Cell 112, which was assigned to the victim Alcantar Ortega. According to Carmona, Alcantar Ortega did not share his cell with any other inmates. Carmona went to assist Barroso and began pulling Alcantar Ortega, who was lying on the floor by the door, out of the cell.[7] Carmona saw Romero and Sanchez Cortez

---

[4] Unless otherwise specified, all dates are from 2018.

[5] SVSP is designated as a "high security" prison.

[6] Carmona explained that "recalling dayroom" is the period when inmates are directed to leave the dayroom and return to their cells. During recall, Carmona would open cell doors "a section at a time" so that the inmates could reenter their cells.

[7] On cross-examination, Carmona said he saw Alcantar Ortega get "dragged out" after which Romero and Sanchez Cortez were removed from the cell.

3

inside Cell 112 as well.[8]  Carmona did not see anyone go into Cell 112 before the floor officers reported that there was a fight.

On January 12, correctional officer Lucio Cuevas was working as a yard officer at SVSP.  At approximately 11:21 a.m., the incident alarm went off in the yard of B-4.  Cuevas responded and saw "blood in … Cell 112. … on the floor [coming from under the door] and smeared in the window."  Cuevas looked through the cell window and saw Alcantar Ortega, who "had visible injuries and blood," lying face up on the floor with his head near the door.  Cuevas also saw Romero and Sanchez Cortez inside the cell, both of whom "had bloodstains [on their clothing]," by Alcantar Ortega's feet.  On cross-examination, Cuevas said that Romero and Sanchez Cuevas had "about the same" amount of blood on their clothing.

Once the door to the cell was unlocked, Cuevas dragged Alcantar Ortega, who was not moving, out of the cell by his armpits.  Cuevas closed the door and waited for additional staff before he handcuffed and removed Romero from the cell.  Cuevas escorted Romero to the dayroom and guarded him there, so he did not see Sanchez Cortez being removed.

Correctional officer Seth Puckett was working as a floor officer in B-4 at SVSP on January 12.  At approximately 11:21 a.m., Puckett heard a "loud bang on … one of the doors, and … heard a 'man down' come from one of the cells."  Puckett noticed blood on one of the cell's windows and blood seeping under the door, so he alerted his partner there was a possible cell fight and activated his alarm.

---

[8] Carmona testified that Romero was assigned to Cell 118 and Sanchez Cortez was assigned to Cell 125.

4

When Puckett reached the door, he could not see inside the cell as it was dark, and the back window was covered. Puckett used his flashlight and saw Romero and Sanchez Cortez standing in the middle of the cell looking toward the door. Puckett knew that Alcantar Ortega was assigned to that cell and Romero and Sanchez Cortez were not.[9] Puckett could not see Alcantar Ortega inside the cell but he waited for additional staff to respond before opening the door.

Puckett's supervisor, Sergeant Barroso, arrived on scene and ordered the control booth officer to unlock the cell door. When the door opened, Puckett saw Alcantar Ortega lying on the floor "lifeless" with multiple injuries to his face and upper body and "a lot of blood."

Puckett helped Cuevas pull Alcantar Ortega out of the cell so he could receive medical attention. Sergeant Barroso ordered Romero and Sanchez Cortez to face the back wall of the cell, put their hands behind their backs, and step backwards out of the cell one at a time. As each inmate exited the cell, they were handcuffed and placed against a wall for evidence collection.

Lieutenant Barroso[10] responded to the report of a fight in Facility B-4 on January 12. When he arrived on scene, Barroso saw Puckett and Fox in front of Cell 112. Barroso could see blood seeping underneath the door to that cell and blood spatter on the window. Through the window, Barroso saw two inmates standing at the back of the cell, looking toward the door, and a third inmate lying motionless on the floor. Barroso directed the control officer to unlock Cell 112 and, after the door was pulled open, he directed the two inmates standing inside to face the back wall of the cell and put their hands behind their heads. Barroso also

---

[9] Puckett, after reviewing his report, testified that Sanchez Cortez was assigned to Cell 119 and Romero was assigned to Cell 125.

[10] Barroso clarified that he was a sergeant at the time of the January 12 incident.

5

told the other correctional officers to remove the injured inmate from the cell. After the third inmate was outside receiving medical attention, Barroso had correctional officers remove the other two inmates, one by one, from the cell and place them in restraints. Barroso identified Sanchez Cortez and Romero in court as those two inmates.

According to Barroso, when he first looked into the cell, Sanchez Cortez had "kind of a crazy smile," whereas Romero was shaking and looked shocked. Barroso observed that both inmates' hands were "trembling and shaking." He did not see either inmate holding a weapon. The inmates were covered in blood and, as they stood there, Barroso saw Sanchez Cortez use his thumb to wipe something off Romero's head.

In the ensuing investigation, a correctional officer photographed the inside of the cell after Romero and Sanchez Cortez were removed, documenting the blood on various objects in the cell, as well as two inmate-manufactured weapons discovered in the toilet. The weapons were admitted into evidence and exhibited to the jury.

Another officer photographed Romero and Sanchez Cortez. Sanchez Cortez had "quite a bit of blood" on his clothing and his person, with blood spatter on his face, hands, wrists, forearms, stomach, and front lower body. Romero had blood spatter on his forehead, eye, hands, shoes, and knee. The photographs of Sanchez Cortez and Romero were exhibited to the jury and admitted into evidence. The officer taking the photographs did not observe any injuries of note on either Sanchez Cortez or Romero.

After Alcantar Ortega was transported to the hospital, a correctional officer searched his clothing but found no weapons.

6

### b. Autopsy evidence

Dr. Venus Azar, a forensic pathologist with the Monterey County Coroner's office, testified as an expert in forensic pathology. Dr. Azar performed the autopsy on Alcantar Ortega on January 18 and noted that medical personnel had placed 220 "staples or sutures" in attempting to treat his injuries.

In all, Alcantar Ortega had more than 70 "sharp force injuries," which includes stab wounds and incision wounds. Dr. Azar counted 17 stab wounds on Alcantar Ortega's head, one of which "penetrated into the cranial cavity."[11] Alcantar Ortega has 12 stab wounds to his neck, most of which were superficial, but one "puncture[d] or involve[d]" his jugular vein. Dr. Azar noted 20 stab wounds and 15 skin incisions or punctures on Alcantar Ortega's torso. One of the stab wounds on his torso punctured his left lung, collapsing it. Finally, Alcantar Ortega had three stab wounds to his right arm or shoulder and nine stab wounds to his right thigh and leg. The deepest stab wound to his leg was seven inches in depth.

Dr. Azar determined that the cause of death was multiple stab wounds, and the manner of death was homicide. Her opinion was based on the fact that Alcantar Ortega "was bleeding profusely" on arrival to the hospital, as well as the injuries to major blood vessels in his head and neck, and the injury to his left lung.

### 2. Defense case

### a. Sanchez Cortez's testimony

Prior to Sanchez Cortez taking the witness stand, the court informed the jury that the parties stipulated that, at the time of the stabbing, Sanchez Cortez was serving a life term in prison.

---

[11] Dr. Azar subsequently testified that two stab wounds "penetrated … into the cranial cavity[,] … [where] they severed a major blood vessel that supplies the brain with blood."

Sanchez Cortez testified that, on January 12, he was returning to his cell from the dayroom but that Alcantar Ortega "didn't want to go into his cell for whatever reason." Sanchez Cortez said that his cell, Cell 119, was not on the same side of the tier as Cell 112 and was "about 30 yards away." Sanchez Cortez said that Alcantar Ortega was a "northerner" like himself and Romero.[12] The floor officers told Alcantar Ortega to go into his cell, but he did not comply. Sanchez Cortez said the floor officers "kind of looked around" and "wanted to go on with their job" so Sanchez Cortez "voluntarily went [to Alcantar Ortega's cell] to assist them."

Sanchez Cortez walked over to Alcantar Ortega and told him, "two, three, four times," " 'Get into your cell.' " Alcantar Ortega refused to do so and began arguing with Sanchez Cortez. Each time Alcantar Ortega refused, he got louder and "more aggressive." Sanchez Cortez told him that it was " 'not up for argument' " and that Alcantar Ortega needed to get in his cell so " 'program can continue.' " Sanchez Cortez testified that if the inmates "hold up program," the correctional officers will get them in trouble.

Sanchez Cortez said that their argument "led to an altercation" and he and Alcantar Ortega began to fight. Sanchez Cortez was "pretty sure" he threw the first punch. When Alcantar Ortega punched Sanchez Cortez in the lip, Sanchez Cortez "got pretty mad."

Sanchez Cortez had two knives in his pocket, and it was "not unusual for people to carry weapons" given that it was a "Level IV prison." Sanchez Cortez pulled out one of his knives and stabbed Alcantar Ortega in the throat because "he's bigger than me." Sanchez Cortez said he "stabbed [Alcantar Ortega]

---

[12] Sanchez Cortez further testified that, at the time of trial, Romero was no longer a northerner.

8

repeatedly on the tier." They ended up inside Alcantar Ortega's cell "where we were just going at it, just me and him, one on one." Alcantar Ortega was "throwing punches back." Sanchez Cortez "stabbed him again and again and again and again" inside the cell and stabbed him "everywhere." Alcantar Ortega slipped and fell but Sanchez Cortez "let him get back up" and they continued to fight. Sanchez Cortez "continued to stab him[] [¶] [and] [] didn't stop." Alcantar Ortega fell on the bunk and Sanchez Cortez "jumped on him[] [a]nd [] stabbed him some more. … maybe in the back of the neck or in the back."[13] When Alcantar Ortega ran for the door, which was shut, Sanchez Cortez "stabbed him [] in the back of the neck" and stabbed him "[m]aybe" more than 15 times. Alcantar Ortega fell to the floor and Sanchez Cortez "stabbed him a few times while he was down." Sanchez Cortez stabbed Alcantar Ortega in "the nape of his neck and pulled [his knife] upwards." Sanchez Cortez said that he was not trying to kill Alcantar Ortega but was "trying to stop him." Alcantar Ortega got up and threw "a couple more punches[,]" fell back to the floor when Sanchez Cortez punched him again, and "everything was just over."

After "everything kind of [] settled down," Sanchez Cortez heard a loud bang which was the cell door closing. Sanchez Cortez denied closing the cell door. Sanchez Cortez turned and saw Romero, who was yelling at him, " 'Stop, stop, stop.' " At that point, Sanchez Cortez "came to" and saw Alcantar Ortega on the floor. Sanchez Cortez's adrenaline was still pumping and he and Romero stood there for "probably 15 minutes, maybe longer." Romero looked scared and Sanchez Cortez testified that he may have laughed at him. Sanchez Cortez said that Romero did not do anything besides "run in there and try to stop the fight."

---

[13] As Alcantar Ortega was face down on his bunk, Sanchez Cortez testified that he probably stabbed him "[m]ore than 15 [times.]"

Sanchez Cortez told Romero, " 'Damn, you got blood on you.  Like, my bad.' " He then used his fingers to wipe the blood on Romero's head.  Sanchez Cortez took his two knives, threw them both in the toilet but they were too big to flush.

The correctional officers then showed up, removed them from the cell, and asked them what happened.  Sanchez Cortez said that, once the cell door opened, Alcantar Ortega crawled out "really fast" on his own.

### b. Romero's testimony

Romero testified that he was heading back to his cell from the dayroom when he saw Alcantar Ortega and Sanchez Cortez "facing each other" in front of Cell 112.  Romero did not hear what they were discussing but saw them start fighting and go into Cell 112.  He walked over to Cell 112 because he knew that Sanchez Cortez "gets mad easily."

Romero got to the cell and saw the two men exchanging blows, but he did not see a knife in anyone's hand.  He was telling the men to stop fighting but when he saw "an object" in Sanchez Cortez's hand, Romero backed away inside the cell. Romero looked for a way out but saw that the door was closed.  Romero did not close the door and did not see that Alcantar Ortega or Sanchez Cortez closed it. He tried to stay out of the way until correctional officers arrived and remembered "[t]here was a lot of blood."  Romero saw Sanchez Cortez stab Alcantar Ortega multiple times, "all over the body towards the neck, head, back, shoulder."

After Alcantar Ortega was on the ground, Romero saw Sanchez Cortez throw something in the toilet as correctional officers came in.  Romero saw Alcantar Ortega try to crawl out of the cell before he was pulled out by a correctional officer.  Sanchez Cortez came toward him, and Romero froze, thinking Sanchez Cortez was going to hurt him.  Instead, Sanchez Cortez rubbed at something on his head, saying " 'You got blood on you.' "

10

At the time of the stabbing, Romero had a release date.

### 3. Rebuttal

Carmona testified, during recall, floor officers observe inmates walking toward their cells and then start locking the doors. As the inmates moved from the dayroom, Carmona was focused on making sure they were walking to their cells since "[a]nything [] might happen." He did not see Alcantar Ortega and Sanchez Cortez fight nor did he see floor officers have any issue with Alcantar Ortega refusing to enter his cell. Based on his experience, there could not have been a fight outside a cell in the middle of the section without himself or a floor officer observing it. On cross-examination, Carmona said that he did not see anyone in front of Cell 112, nor did he see anyone enter cell, as he was focused on the floor officers "closing down the cells."

## II. DISCUSSION

Sanchez Cortez contends there was insufficient evidence presented to the jury to show he acted with premeditation and deliberation when he killed Alcantar Ortega. In particular, he argues that the jury was not presented with evidence to show that he planned or had a motive to murder Alcantar Ortega and the specifics of the killing itself cannot support a conviction for first degree murder.

The Attorney General argues that there was substantial evidence that Sanchez Cortez both considered his actions beforehand and that he stabbed Alcantar Ortega in a fashion that demonstrated an intent to kill. We agree with the Attorney General.

### A. Applicable legal principles and standard of review

In determining a sufficiency of the evidence claim, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid

11

value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "The role of an appellate court in reviewing the sufficiency of the evidence is limited." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)

"First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 166, superseded by statute on other grounds as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

" ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*).) In other words, "the intent to kill must be formed upon a preexisting reflection and have been the subject of actual deliberation or forethought. [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.) " ' "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may

12

follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " [Citation.]' [Citations.]" (*Solomon*, *supra*, at p. 812.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme Court identified three factors typically present in cases of premeditated murder: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Anderson, supra,* at pp. 26–27.)  The court has subsequently cautioned, however, that " ' "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.  [Citation.]" ' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.)  In other words, the *Anderson* factors do not impose "a straightjacket on the manner in which

13

premeditation can be proven adequately at trial.  [Citations.]"  (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

### B. Analysis

Sanchez Cortez argues that there was insufficient evidence of planning, but he admitted that he armed himself with two inmate-manufactured weapons that day.  While Sanchez Cortez may have armed himself for self-defense, he offered no explanation for having the weapons other than that it was "not unusual for people to carry weapons" in a "Level IV prison."  For the purposes of our substantial evidence review, it is an equally reasonable inference that Sanchez Cortez armed himself in order to attack someone.[14]

The evidence also showed that Sanchez Cortez attacked Alcantar Ortega during a period when a number of inmates were moving from one place to another within the facility and the officers' attention would be divided.  Although Sanchez Cortez testified that he argued with and initiated a fistfight with Alcantar Ortega *outside* the cell, the jury was entitled to disbelieve that testimony and instead conclude that, because the correctional officers did not see any of this happen, the entire encounter happened *inside* Alcantar Ortega's cell.  Even assuming that Sanchez Cortez's version of events could be believed, he admitted not only initiating the fist fight, but that he also pulled out his weapon and stabbed Alcantar Ortega "repeatedly" after Alcantar Ortega punched him in the face.  Sanchez Cortez's first strike was to Alcantar Ortega's throat, which he justified by saying that Alcantar Ortega was "bigger" than he was.  The jury could reasonably infer

---

[14] The jury could reasonably have believed Sanchez Cortez's testimony that he was carrying both weapons that morning but could also reasonably have inferred that: 1) a weapon that could inflict a 7-inch-deep stab wound would be too large to carry around every day for self-defense purposes; and 2) Sanchez Cortez planned to give the second weapon to another inmate, e.g., Romero, to assist him in attacking Alcantar Ortega.

14

that deliberately stabbing someone in the throat, with little provocation, represented a plan to kill that person. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1286–1287 [sufficient evidence of premeditation and deliberation where defendant, without provocation, stabbed victim in the chest, penetrating rib and heart].)

Sanchez Cortez further admitted that, even once he and Alcantar Ortega were inside the cell, he continued to stab Alcantar Ortega repeatedly. Sanchez Cortez stabbed Alcantar Ortega multiple times after he fell onto his bunk, after he tried to run to the (somehow closed) cell door, and multiple times after he fell to the floor.[15] Even if, as Sanchez Cortez argues, the 70-plus stab wounds he inflicted on Alcantar Ortega "were only suggestive of rage, an inference of premeditation is not precluded. [Citation.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 659.) The number of stab wounds and how Sanchez Cortez continued to inflict them when Alcantar Ortega was defenseless and trying to escape is substantial evidence that Sanchez Cortez did not simply intend to subdue Alcantar Ortega or punish him for refusing to go into his cell but that he intended to kill him.

Sanchez Cortez also argues that there was no evidence to indicate that he had a motive to kill Alcantar Ortega who he described as a fellow "northerner." "But the lack of a discernable rational motive does not preclude a conviction for first degree premeditated murder." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 202.) The evidence presented at trial showed that Sanchez Cortez initiated a fight

---

[15] Sanchez Cortez testified that Alcantar Ortega continued to fight back and punch him. Romero also testified that he saw Alcantar Ortega throwing punches. However, the jury was not required to believe either of them on this issue. The correctional officers who photographed Sanchez Cortez and Romero after the killing testified that neither man had any injuries of any significance.

15

with Alcantar Ortega, pulled out a knife and stabbed him in the throat then stabbed him multiple times in the head, neck, chest, and legs. Sanchez Cortez continued stabbing Alcantar Cortez as he was prone on the bunk, on the floor, and as he attempted to flee his cell. Sanchez Cortez's own testimony supports the jury's findings that he killed Alcantar with premeditation and deliberation.

### III. DISPOSITION

The judgment is affirmed.

_____
WILSON, J.

WE CONCUR:


_____
GROVER, ACTING P. J.



_____
LIE, J.




*The People v. Sanchez Cortez*
H052814